**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT:

**MARK SMALL**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES:

**NATALIE A. FANTETTI**
Indiana Department of Child Services
Peru, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

FILED

Apr 30 2013, 9:21 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENT-CHILD RELATIONSHIP Of R.R. and T.R., Minor Children, | ) ) ) ) | |
| R.R., Father, | ) ) | |
| Appellant-Respondent, | ) ) | |
| vs. | ) ) | No. 52A02-1208-JT-665 |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) | |
| Appellee-Petitioner. | ) ) | |

APPEAL FROM THE MIAMI SUPERIOR COURT
The Honorable Daniel C. Banina, Judge
Cause Nos. 52D02-1106-JT-8; 52D02-1106-JT-10

**April 30, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**MAY, Judge**

R.R. (Father) appeals the involuntary termination of his parental rights to Ri.R. and T.R. (collectively, Children). He argues the Department of Child Services (DCS) did not present sufficient evidence there was a reasonable possibility the conditions that resulted in Children's removal would not be remedied. We affirm.

## FACTS AND PROCEDURAL HISTORY

Ri.R. was born to Father and B.R.[1] on February 28, 2003. On September 29, 2009, he was removed from Father's care because Father's girlfriend, S.S., struck and injured Ri.R.. Ri.R. was placed in foster care, where he remained during the proceedings.

T.R. was born to Father and S.S.[2] on December 31, 2008. On February 18, 2010, she was removed from Father's care because she "appeared lethargic and sickly, and her feces were like little white rocks. Neither [S.S.] nor Father seemed to see [T.R.'s] condition as alarming." (App. at 37.) She was placed in the same foster care home as Ri.R., where she remained during the proceedings.

The Children were each adjudicated as Children in Need of Services (CHINS). Father was ordered to, among other things, participate in substance abuse services; participate in home-based services to "address issues of domestic violence, abuse/neglect, and parenting;" attend visitation with Children; address mental health issues; attend domestic violence group therapy sessions; and provide documentation of financial responsibility or full-time employment. (*Id*. at 53.) On July 14, the juvenile court found Father in indirect contempt,

---

[1] B.R.'s parental rights were terminated prior to Father's rights.

[2] S.S.'s parental rights were not terminated.

2

because he did not participate in some of the services ordered, and sentenced him to ninety days in jail. The sentence was suspended as long as Father complied with some requirements already ordered, specifically to continue supervised visitation and be on time for all visits; continue individual and couples counseling with S.S.; continue home-based services; participate in a psychiatric evaluation and receive medication for anxiety and ADHD; and "participate in a medical evaluation for his back problem and seek alternatives to the use of methadone for pain management if recommended by a licensed physician not affiliated with the methadone clinic." (*Id*.)

On July 1, 2011, DCS petitioned for the involuntary termination of Father's parental rights. On April 30, 2012, and May 1, 2012, the juvenile court held evidentiary hearings regarding each child, and on July 17, 2012, it terminated Father's rights.

## DISCUSSION AND DECISION

We review termination of parental rights with great deference. *In re K.S., D.S., and B.G.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). We will not reweigh evidence or judge credibility of witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id*. In deference to the juvenile court's unique position to assess the evidence, we will set aside a judgment terminating a parent's rights only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*, *cert. denied* 534 U.S. 1161 (2002).

When, as here, a judgment contains specific findings of fact and conclusions thereon,

3

we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). We determine first whether the evidence supports the findings and second whether the findings support the judgment. *Id*. "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the juvenile court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

However, Father does not challenge the juvenile court's findings; rather he asserts only that the findings are insufficient to support its judgment. Therefore, we need not look at the evidence presented, but only to the findings to determine whether they support the judgment. *See Smith v. Miller Builders, Inc.*, 741 N.E.2d 731, 734 (Ind. Ct. App. 2000).

"The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. A juvenile court must subordinate the interests of the parents to those of the child, however, when evaluating the circumstances surrounding a termination. *In re K.S.*, 750 N.E.2d at 837. The right to raise one's own child should not be terminated solely because there is a better home available for the child, *id*., but parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id*. at 836.

To terminate a parent-child relationship in Indiana, the State must allege and prove:

(A)    that one (1) of the following is true:
    (i)    The child has been removed from the parent for at least six (6)

4

months under a dispositional decree.

(ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

(iii) The child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State must provide clear and convincing proof of these allegations. *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009), *reh'g denied*. If the court finds the allegations in the petition are true, it must terminate the parent-child relationship. Ind. Code § 31-35-2-8.

In deciding whether the conditions that resulted in a child's removal will not be remedied, a juvenile court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. It must evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future

neglect or deprivation. *Id.* Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*.

The juvenile court also may consider, as evidence whether conditions will be remedied, the services offered to the parent by DCS and the parent's response to those services. *Id.* A juvenile court need not wait until a child is irreversibly harmed by a deficient lifestyle such that his or her physical, mental, and social growth are permanently impaired before terminating the parent-child relationship. *In re E.S.*, 762 N.E.2d 1287, 1290 (Ind. Ct. App. 2002).

Father argues the evidence was insufficient to terminate his rights to Children because: (1) the condition that resulted in Ri.R.'s removal, abuse at the hands of Father's girlfriend, S.S., had been remedied because Father no longer lived with S.S.; and (2) the conditions that resulted in T.R.'s removal, failure to thrive, had been remedied because Father made an effort to learn more about T.R.'s medical problems and he participated in services. We disagree.

1. <u>Remedy of Conditions Resulting in Ri.R.'s Removal</u>

On September 29, 2009, DCS removed Ri.R. from Father's home because Father's girlfriend, S.S., struck Ri.R. As S.S., and not Father, struck Ri.R., and as Father and S.S. no longer live together, Father argues the conditions under which Ri.R. was removed from Father's care are unlikely to recur.

After Ri.R.'s termination hearing, the juvenile court made the following findings regarding Father's participation in services:

19. In the CHINS case, Father was ordered in the dispositional order, in the order on the rule to show cause . . . to lower his use of methadone. However, Father never attempted to do so, saying he was not court ordered to reduce his methadone usage.

20. The first step to lowering Father's methadone usages was to be Father having his back pain evaluated. Father could not afford to have his back pain evaluated at the Community Health Center; however, he was able to pay $80 - $84 for his methadone weekly.

21. Father had not missed more than a few methadone clinic appointments in the past 5 or 6 years, but he missed approximately fourteen out of forty-one visitation opportunities with his Child between February, 2010 and April, 2011 due to "emergencies."

* * * * *

23. Father did not maintain employment as required in the rule to show cause and the outline; Father opined he worked at Swifty's throughout most of 2011. However when asked if he was fired from Swifty's in March, 2011, Father agreed that was correct.

* * * * *

25. Father claimed that he worked at his own business, R & J Tree Service, until he was forced to give it up while working on budgeting with the home-based provider. [S.S.] testified that Father had not worked at the tree service during the time she lived with him, from January, 2008 through January, 2012.

26. Father and [S.S.] never attended any type of Domestic Violence support groups . . .

27. There was ongoing domestic violence in the home from the time [S.S] became pregnant with [T.R.] until she left the final time in December, 2011. The physical violence occurred approximately thirty times during the course of the relationship.

* * * * *

29. Child witnessed Father physically and emotionally abuse [S.S.].

* * * * *

33. Father initially refused to cooperate with any services other than visitation.

* * * * *

44. Father struggled with engaging with Child during visitation in this DCS office. He frequently paced, complained that he had ADD and was not on medication, therefore he could not be confined in the visitation room at the office. When visits took place in the community, Father had to be reminded to stay focused on the Child and keeping him safe. Father frequently arrived late

7

and left early, which caused Child extreme anxiety.

45. Father never progressed to the point in visitation with Child that DCS recommended visits be unsupervised or even partially supervised.

\* \* \* \* \*

55. Father and [S.S.] desired to have their children at home; however, they could not sustain the changes in their relationship necessary to get the children home.

\* \* \* \* \*

58. Father is not likely to change, and it is very unlikely he will ever be able to effectively parent Child on his own.

59. Father attended a medication evaluation at Four County Counseling Center in December 2010; he was prescribed medication for his ADHD.

60. Father received samples, took the medication for a day or two and then stopped. The medication bottle was sitting in the kitchen as of the day [S.S.] left in December, 2011.

61. Father variously stated that he could not use the medication around heavy equipment, that the medication had side effects that he could not deal with, and that Four County Counseling Center wanted to charge for refills. Father never returned to Four County Counseling Center to be reevaluated.

\* \* \* \* \*

66. Father has not changed his behavior since the inception of the CHINS case, and there is not a historical basis to say that Father is reasonably likely to change.

67. Throughout the underlying CHINS' [sic] case, Father did not demonstrate that he was ready and able to parent the children. Father was resistant to services, was not forthcoming with information, failed to complete services, and failed to demonstrate an ability to benefit from services he had received; his services with Family Service Society and White's Family Services were closed unsuccessfully, and Four County Counseling Center closed its referral because Father did not attend appointments.

68. During the time that Child had ongoing supervised visitation, his behavior deteriorated, especially after visits. Child would become more aggressive toward members of his foster family, especially the girls; he showed no respect for women/girls, hitting and bullying them, and saying that they "deserved" it. He became resistant to adult (female) supervision or redirection.

(App. at 56-61.)

We consider a parent's unresponsiveness, uncooperativeness, and unwillingness to complete assigned services, in addition to the statutory elements required, when determining

8

sufficiency of evidence for termination of parent-child relationship. *See In re L.S.*, 717 N.E.2d at 210 ("pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change"). While it is true Father participated in some services, he did not complete them. Therefore, based on Father's inability to complete services and lack of progress with the domestic violence issues in the household, the juvenile court did not err when it terminated Father's parental rights to Ri.R. Father's arguments to the contrary are invitations for us to reweigh the evidence, and we cannot. *See In re D.D.*, 804 N.E.2d at 265 (appellate court will not reweigh evidence or judge credibility of witnesses).

 2. Remedy of Conditions Resulting in T.R.'s Removal

On February 18, 2010, DCS removed T.R. from Father's care because she "appeared lethargic and sickly, and her feces were like little white rocks. Neither [S.S.] nor Father seemed to see [T.R.'s] condition as alarming." (App. at 37.) Father argues since he has learned about T.R.'s medical conditions and how to treat them, the conditions under which T.R. was removed from Father's care are unlikely to recur. We cannot agree.

The juvenile court incorporated many of the findings from the order terminating Father's rights to Ri.R. and included additional findings regarding T.R.:

 32. [T.R.] was diagnosed as Failure to Thrive with no known medical cause. Father and [S.S.] were given lists of appropriate foods for visits by the foster parents, but Father often failed to follow them, and denied even seeing such a list.

 * * * * *

9

34.  Father had a limited grasp of what [T.R.] could do based on her age and maturity level.  Father received verbal instruction, hand-outs and a DVD program addressing child development and developmental milestones.  Despite continuing instruction, Father showed limited, if any, progress in his understanding of these concepts.

\* \* \* \* \*

36.  Throughout much of the CHINS case, Father obsessed about [T.R.'s] health, and whether she was eating properly and getting enough rest at the foster home.  Father would hover over [T.R.] during visits, micromanaging [T.R.] verbally, and overstimulating [T.R.].

(*Id*. at 43) (citations to testimony omitted).  As noted in our discussion of the termination of Father's rights to Ri.R., Father made some effort to complete some services, however, based on his unwillingness to complete other services and his lack of understanding regarding the proper way to care for T.R., we cannot say the juvenile court erred when it determined there was no reasonable probability that Father would remedy his inability to properly parent T.R.  Father's arguments to the contrary are invitations for us to reweigh the evidence, which we may not do.  *See In re D.D*., 804 N.E.2d at 265 (appellate court will not reweigh evidence or judge credibility of witnesses).

## CONCLUSION

DCS presented sufficient evidence to prove the conditions under which Ri.R. and T.R. were removed from Father's care would not be remedied.  Therefore, the juvenile court did not err when it terminated Father's parental rights to the Children, and we affirm.

Affirmed.

BAKER, J., and MATHIAS, J., concur.